UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LYNICA MORALES,
*on behalf of herself and all others similarly situated*

                Plaintiff,

     -against-                **REPORT AND RECOMMENDATION**
                                  15-CV-502-RJD-SJB

ROCHDALE VILLAGE, INC.,
MARION SCOTT REAL ESTATE INC.,
MARION SCOTT,
HERBERT FREEDMAN,

                Defendants.
------------------------------------------------------------------X

**BULSARA, United States Magistrate Judge:**

      Plaintiff Lynica Morales ("Morales") commenced this action individually and on behalf of a putative class on February 2, 2015 against Defendants Rochdale Village, Inc. ("Rochdale"), Marion Scott Real Estate Inc. ("MSRE"), Marion Scott ("Scott), and Herbert Freedman ("Freedman) (collectively "Defendants") alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and New York Labor Law ("NYLL").  Rochdale operates Rochdale Village, a large housing cooperative located in Jamaica, Queens.

      In May 2016, Morales moved for conditional certification of a collective action, (Motion to Certify FLSA Collective Action, Dkt. No. 51); that motion was granted, (Memorandum and Order dated August 15, 2016, Dkt. No. 63); and 124 employees opted into the action.  (Memorandum of Law in Support of Plaintiff's Motion Pursuant to Federal Rule 23 for Class Certification, Dkt. No. 126 ("Pls.' Br.") at 3).  On February 14, 2018, Morales and two other proposed class representatives, Dawn Thompson ("Thompson") and Cynthia Saunders ("Saunders") moved for certification of a class of

hourly paid and non-exempt employees, and the appointment of the law firm of McLaughlin & Stern, LLP ("M&S") as class counsel.  On February 27, 2018, the Honorable Raymond J. Dearie referred the motion to the undersigned for a report and recommendation.  For the reasons stated below, it is respectfully recommended that the motion for class certification be granted.

Factual Background and Procedural History

A. <u>Defendants</u>

Rochdale operates Rochdale Village, the second largest cooperative housing development in the world.  (Compl. ¶ 10).  Rochdale Village has 5,860 residential units in 20 high-rise buildings, two shopping centers, various commercial offices, a parking facility, a privately maintained electric generating power plant, and recreational and community facilities.  (*Id.*)  MSRE is the property manager for all of residential and commercial units.  (*Id.* ¶ 12).  Scott is the majority owner, director and officer of MSRE and holds a 51% ownership interest; Freedman is the minority owner, secretary and general counsel of MSRE and has a 49% ownership interest.  (*Id.* ¶¶ 13-14).

Rochdale employs both union and non-unionized employees.  (Deposition of Darius George, attached as Ex. A to Declaration of Lee S. Shalov in Support of Plaintiff's Motion Pursuant to Federal Rule 23  dated January 20, 2017 ("Shalov Decl."), Dkt. No. 126 ("George Dep.") at 63:3-8).  The three unions with employees at Rochdale are Local 32B-J, Local 94 and the Special and Superior Officers Benevolent Association ("SSOBA").  (*Id.*)  There are four main departments at Rochdale: Maintenance, Public

Safety, Community Center, and the Power Plant.  (*Id.* at 73:11-15).[1]  Maintenance has

Local 32B-J members; Public Safety has SSOBA members; and the Power Plant has

Local 94 members working at their respective locations.  (*Id.* at 73:18-74:4).

Nonunionized employees work at the Community Center.  (*Id.* at 74:9-11).

 Since February 2, 2012, Rochdale has employed 483 hourly paid and non-exempt

employees.  (Pls.' Br. at 3).  105 are members of SSOBA and 32 are in Local 94.

(Transcript of Proceedings held on April 20, 2018, Dkt. No. 138 ("Oral Argument Tr.") at

33:19-34:2).  Rochdale currently has 355 employees, of which 26 are exempt,[2]  46 are

hourly non-unionized employees, and 283 are hourly unionized employees.

---

[1] Defendants assert that Rochdale has fourteen departments.  (Supplemental Memorandum in Opposition to Motion to Certify Class ("Defs.' Supplemental Br."), Dkt. No. 141 at 1).  Some of the departments by Defendants, however, employ exempt employees or no employees at all.  For instance, Defendants list the Board of Directors as a department.

[2] Neither party defines what it means to be a "non-exempt" employee.  It appears, that the parties are referring to employees exempt from FLSA or NYLL protections, specifically those employees subject to "executive employee" regulations that exempt employees who serve in a supervisory or managerial capacity.  For example, in challenging Morales's adequacy as a class representative as for part of the class period, Defendants contend that she was an exempt employee.  (*See* Defendants' Memorandum of Law in Opposition to Motion for Class Certification dated January 12, 2018, Dkt. No. 127 ("Defs.' Resp.") at 16 ("Ms. Morales cannot adequately represent the class as she was classified as an exempt employee and was responsible for some of the alleged wage and hour violations at issue in this litigation. . . .  In or about November 2012, Plaintiff received a promotion to the title of Purchasing Supervisor and held this title until the termination of her employment in October 2014.  Plaintiff was classified as an exempt administrative employee."); Deposition of Lynica Morales, attached as Ex. P. to Wilkinson Decl., Ex. P ("Morales Tr.") at 77:7-10 (Q: "Do you know, if during your years of employment at Rochdale, you were ever classified as exempt from overtime by Rochdale?" A: "No.  I was not accepted.").

(Declaration of Jay Williams in Opposition to Plaintiff's Motion for Conditional Certification dated May 13, 2016 ("Williams Decl."), Dkt. No. 54 ¶ 7).[3]

B. <u>Plaintiffs</u>

Morales alleges that she was employed by Rochdale as an hourly paid, non-exempt employee at Rochdale Village from May 2011 to October 2014.  (Compl. ¶ 8).  From May 2011 until January 2012, she was employed as a Purchasing Assistant.  (*Id.*)  In January 2012, she was promoted to the position of Purchasing Supervisor, and held this post until her termination in October 2014.[4]  (*Id.*)

Proposed class representative Thompson is an opt-in plaintiff.  (Declaration of Dawn Thompson dated December 2, 2016, attached as Ex. E to Shalov Decl., Dkt. No. 126 ("Thompson Decl.") ¶ 1).  Thompson began her employment as a patrolwoman in June 2011 and remains currently employed by Rochdale.  (*Id.* ¶ 2).

Proposed class representative Saunders is also an opt-in plaintiff.  (Declaration of Cynthia Saunders dated November 29, 2016, attached as Ex. F to Shalov Decl., Dkt. No. 126 ("Saunders Decl.") ¶ 1).  Saunders began her employment as a public safety officer in July 2010, and remains employed by Rochdale.  (*Id.* ¶ 2).

C. <u>Defendants' Alleged Unlawful Policies</u>

Plaintiffs allege that Defendants engaged in a number of practices that resulted in failure to compensate them for their actual hours worked or overtime.  (Compl. ¶ 3).

---

[3] There are small discrepancies about these numbers.  George testified that approximately 280 nonexempt employees currently work at Rochdale, including union members.  (George Dep. at 74:25-75:4).  Defendants' response states that Rochdale currently employs 352 employees; but cites the Williams Declaration, which refers to 355 current employees.  (Defs.' Resp. at 2).

[4] Williams indicated that Morales's promotion occurred in November 2012.  (Williams Decl. ¶ 15).

Plaintiffs have made different allegations (even within the class certification briefing) about how many policies they allege were unlawful.  (*Compare* Pls.' Br. at 3 (listing four alleged unlawful policies) *with* Reply Memorandum of Law in Further Support of Plaintiff's Motion Pursuant to Federal Rule 23 dated February 14, 2018, Dkt. No. 129 ("Pls.' Reply") at 6 (suggesting five common questions)).  The Court's exhaustive review of the evidence submitted, the pleadings and the briefings lead it to conclude that Plaintiffs are alleging, and the evidence submitted relates to, *two* allegedly unlawful policies: (1) Rochdale's policy of paying employees based on their "shift time," *i.e.* the time they were scheduled to work, rather than their "clock in/clock out" time; (2) Rochdale's policy of subtracting one hour each day from each employee's total work hours as a meal break, regardless of whether they took the entire hour as a break.[5] Plaintiffs dress up examples of how those policies were implemented as separate policies or common class questions; however, at bottom, they are examples of one of these two policies.  For example, Plaintiffs allege that Rochdale's clocks "rounded" employees' time sheets to their schedule, and paid them only based on their scheduled time.  They also allege that supervisors hand wrote deductions on time sheets to reduce an employee's "clock time" to their scheduled time, and paid them only for their scheduled time.  These practices, to the extent they exist, merely illustrate the implementation of the first identified Rochdale policy, namely paying employees based solely on their scheduled time, not the time they actually worked.  (*E.g.*, Pls.' Reply at 6 ("Are Rochdale's time clocks configured to round employee time so that Class members are

_____

[5] Even these two questions could be considered one common question of whether employees were paid based on their scheduled time rather than actual time worked whether before or after their scheduled shifts or during meal breaks, as measured by their "clock" time.

paid by their shifts as opposed to actual time worked?").  To consider these examples as additional common class questions or as separate policies does not advance or help resolve the class certification question; if anything, it needlessly complicates it.

For the purposes of detailing the record evidence in support of Plaintiffs' motion, the Court is doing so around the two policies Plaintiffs have alleged as being common to all class members.  And where appropriate the Court has included the various examples of the existence or implementation of such a policy:

### 1. Policy of Only Paying Scheduled Time

Plaintiffs allege that they were paid only based on their scheduled shift time, rather than the actual time that they clocked in and out, unless they received preapproval to do so.  (Compl. ¶¶ 19-21).  In other words, even if working beyond their scheduled time resulted in their working overtime—absent approval—employees were not compensated.

According to Darius George ("George"), Rochdale's former controller, Rochdale had a practice or policy as "scheduled-based pay," (George Dep. at 37:20-25):[6] "to pay employees according to . . . schedule" regardless if there were additional hours worked, if there was no preapproval.  (*Id*. at 62:6-12).  This policy failed to compensate for time worked beyond an employee's schedule:

---

[6] George was "in charge of the overall accounting functions of Rochdale Village, and also the computer systems, their IT system."  (George Dep. at 55:13-15).  In addition, George was in charge of the payroll practices for Rochdale Village.  (*Id*. at 56:6-8).  He did not, however, have dealings with or oversight of payroll practices for unionized employees.  (*Id*. at 62:17-21).  Payroll practices for union employees were handled by their individual supervisors.  (*Id*. at 62:25-63:1; 64:22-65:3).

George was employed by Rochdale for 32 years, from November 1983 until his retirement in September 2015, and held the position of controller for the entirety of his employment.  (*Id*. at 13:4-12; 55:6-10).

Q: So if that person clocked in at 8:45 a.m. for a 9:00 a.m. shift, would that person be paid from 8:45, or from 9:00 a.m.?

A: From 9:00 a.m.

Q: And if a person clocks out, using my same example, the 9:00 to 5:00, at 5:15 or 5:20, would that person be paid until 5:15 or 5:20, or would that person be paid to the end of their scheduled shift at 5:00? . . .

A: The person would be paid up to 5:00 p.m.

(*Id.* at 36:2-16; *see also* Deposition of Elizabeth Goldsmith, attached as Ex. T to Shalov Decl., Dkt. No. 126 ("Goldsmith Dep.") at 88:25-89:8 (Q: "If an employee works in excess of his scheduled hours, and those are – times are not preapproved by a manager, regardless of the department, isn't it [Rochdale's] default policy to pay that employee according to their schedule?" . . . A: "Default, yes.")).[7]  If, however, employees received authorization to work outside their scheduled shift, they were compensated for all the time worked.  (*Id.* at 39:19-22).  If they did not receive such approval, they were not paid.  (*Id.* at 40:6-10 (Q: "So an employee, if they worked during the pre-shift window or the post-shift window and they didn't receive approval, wouldn't get paid for that time." A: "That is correct."); 105:2-5 (Q: "Okay.  But any time that an employee works unapproved overtime, they're not paid for that."  A: "They're not paid for that."); (Deposition of Lilibeth Rosales, attached as Ex. C to Shalov Decl., Dkt. No. 126 ("Rosales Dep.") at 69:16-21 (Q: "My question is if an employee clocks in before the start [of] their scheduled shift and performs work during that time but they don't submit an overtime

---

[7] Goldsmith ("Goldsmith") was Rochdale's Human Resources Director.  (Goldsmith Dep. at 7:16-20).  She worked at Rochdale for 37 years, and retired in August 2015.  (*Id.* at 51:15-25).

sheet, they're not paid for that time, correct?"  A: "Correct."); 86:2-8; 191:12-18);[8]

Goldsmith Dep. at 29:11-16).  The policy was used for both union and nonunionized

employees.  (George Dep. at 62:13-16; 65:17-25; 76:15-77:9).  The policy was in practice

until at least September 2015, (*id.* at 98:14-18), across all of Rochdale's four main

departments: Maintenance, Public Safety, the Power Plant, and the Community Center.

(*Id.* at 145:12-146:6; Rosales Dep. at 94:21-96:7).

This policy of paying only shift-time was implemented by Rochdale management.

(George Dep. at 40:23-25) (Q: "Do you know who implemented that policy?"  A:

"Management.").  Management included Defendant Scott.  (*Id.* at 41:2-10; 66:9-13;

122:15-18 ("But Marion Scott instructed you to pay employees according to schedule,

not when they clocked in and clocked out, correct?"  A: "Correct."); Rosales Dep. at

100:8-101:6).

For employees under his supervision, George would not approve hours worked by

an employee, if they were beyond the employee's shift schedule.  (George Dep. at 53:10-

54:11).  George supervised between seven and nine employees at any given time.  (*Id.* at

59:9-11).  One of his employees regularly worked before and after his shift time, because

of "the volume of work," and was not paid unless George approved the overtime.  (*Id.* at

117:6-13).  George did not know how other supervisors in other departments handled

approvals of their respective employees' time sheet entries.  (*Id.* at 139:23-140:3).

---

[8] Rosales is Rochdale's payroll clerk.  (Rosales Dep. at 48:20-22).  Rosales is the only employee in the payroll division, a position she has held for 21 years.  (*Id.* at 48:23-25; 49:2-13).  Her responsibilities included review of the time sheets submitted by supervisors and ultimately entering the hours from those sheets to Rochdale's payroll system.  (*Id.* at 50:4-15; 62:13-14 ("I would pay what the supervisors write on the time sheets.")).  She was supervised by George.  (George Dep. at 48:2-13).

The record demonstrates that Rochdale had a policy of only paying employees for their scheduled time, not time worked:

*First,* several employees testified that Rochdale's time cards recorded their "rounded" time, and paid them only for this "rounded" time.  That is, if an employee clocked in earlier than her scheduled shift, the time cards rounded the time to the beginning of her scheduled shift, and if an employee clocked out later than her scheduled shift, the time cards rounded to the end of her scheduled shift.[9]  This was reflected on time cards as "Rounded Time." (*E.g.*, Employee Time Card Listings, attached as Ex. V to Shalov Decl., Dkt. No. 126 ("Ex. V") (indicating "Rounded Time"); Rosales Dep. at 72:16-20 (Q: "Based on this sheet which says 'Actual Time' and Rounded Time, do you understand it—do you understand [Rochdale] to have a rounding policy?" A: "Yes."); Compl. ¶ 3; George Dep. at 124:3-125:8).  This "Rounded Time" ultimately corresponded to an employee's scheduled time.  (George Dep. at 131:5-8).  The time cards also contained a column labeled "Actual Time" that did reflect the clock in and clock out times.  (George Dep. at 130:23-25; Rosales Dep. at 71:23-72:6 (Q: "Is it your understanding that the Actual Time column is actually when employees have clocked in?" A: "Yes."  Q: "And the Rounded Time column is when they're paid for?" . . .  A: "Yes.").  Although time cards reflected both this clocked in time and the rounded time, , the employee was paid based on the rounded time.  (*Id.* at 71:23-72:6).

There are some time cards that show actual time and rounded time as equivalent.  The employee time cards for employees Young, Johnson, and Morales have at least some days where the Actual and Rounded Time are equivalent, even though the Actual

---

[9] Although employees clock in and clock out on different time clocks, they use the same software.  (*Id.* at 76:4-14; Rosales Dep. at 78:10-25).

Time is outside of the employee's shift hours.  (Defs.' Resp. at 10 (citing Ex. V at 3).  But for those same employees, there are time sheets reflecting differences between Actual and Rounded Time, (*see, e.g.*, Ex. V at 16 (Time Card Listing for Lynica Morales for 10/31/2012 showing Actual Time of 7:53:32 and Rounded Time of 8:00:00)), and according to these same three employees, they were regularly not paid for their actual time.[10]  In any event, a significant number of other employees provided evidence demonstrating the existence of the rounding policy, and the practice of being paid according for rounded, not actual time worked.[11]

---

[10] (*E.g.*, Morales Dep. at 114:8-116:13 (Q: "And what's your understanding of what those documents are?"  A: "These are my time sheets." . . .  Q: "Okay.  When you wrote '40 hours, total' on this page . . . what was the reason for making that notation?"  A: "That's what I was trained to do."  Q: "Okay.  And what was that supposed to — was that supposed to advise the accounting department of any information?"  A. "Yes.  To pay me at 40 hours, because I hadn't received approval for any of the times that I worked off-the-clock or over the clock.")).

[11] (*See, e.g.*, Declaration of Jerome Meriweather dated November 18, 2016, attached as Ex. D to Shalov Decl., Dkt. No. 126 ("Meriweather Decl.") ¶¶ 3-10 ("In addition to pre-shift work, I and other Rochdale employees regularly perform off-the-clock work for which we were not compensated."); Thompson Decl. ¶¶ 3-8 ("On those occasions, even though I clocked out around 12:15am, I was only paid as if I had stopped working at 12:00am."); Saunders Decl. ¶¶ 3-8; Declaration of Domingo Lopez dated November 21, 2016, attached as Ex. H to Shalov Decl., Dkt. No. 126 ("Lopez Decl.") ¶¶ 3-11 ("I and other employees are and were not compensated for work performed during periods of pre-shift time rounding."); Declaration of Ansdher Civil dated November 4, 2016, attached as Ex. I to Shalov Decl., Dkt. No. 126 ("Civil Decl.") ¶¶ 3-9; Declaration of John Finlator dated November 22, 2016, attached as Ex. J to Shalov Decl., Dkt. No. 126 ("Finlator Decl.") ¶¶ 3-9; Declaration of Kamel Freeman dated November 5, 2016, attached as Ex. L to Shalov Decl., Dkt. No. 126 ("Freeman Decl.") ¶¶ 3-8 ("When I clocked in at 7:50am, at least twice per week, I was only paid as if I began working at 8:00am.  As such, I and other employees are and were not compensated for work performed during periods of pre-shift time rounding."); Declaration of Lawrence Peebles dated December 16, 2016, attached as Ex. M to Shalov Decl., Dkt. No. 126 ("Peebles Decl.") ¶¶ 3-10; Declaration of Bentley Alleyne dated November 29, 2016, attached as Ex. N to Shalov Decl., Dkt. No. 126 ("Alleyne Decl.") ¶¶ 3-10; Declaration of Shanita Sneed-Smith dated December 19, 2016, attached as Ex. O to Shalov Decl., Dkt. No. 126 ("Sneed-Smith Decl.") ¶¶ 3-9; Declaration of George Bell dated December 23, 2016, attached as Ex. P to Shalov Decl., Dkt. No. 126 ("Bell Decl.") ¶¶ 3-9).

*Second*, there were instances in which a supervisor was instructed to and did annotate an employee's time sheet, so that the employee was paid pursuant to his schedule, irrespective of when he clocked in and out.

Supervisors were responsible for approving an employee's time sheet, (George Dep. at 52:13-14; 136:20-24), and had discretion to change an employee's time records, (Goldsmith Dep. at 201:3-6; 19-20).  According to George, supervisors did this at Scott's direction.  (George Dep. at 66:14-19 (Q: "And when I say this policy, I mean Marion Scott implemented or made the decision to instruct supervisors to cross out the total number of hours worked on time sheets, and record just scheduled hours."  A: "Yes.")). When supervisors did change records, it was because they had not preapproved the overtime worked.[12]  As such, supervisors and management at Rochdale were "remind[ed] to correct the total hours to pay your staff if the daily and weekly computer generated totals were not the totals [they] want[ed] to approve[.]"  (Email from Beth Rosales to Carey Jones, *et al.*, dated February 10, 2016, attached as Ex. W to Shalov Decl., Dkt. No. 126 ("Rosales Email")).

What the supervisor wrote on the time cards determined the hours for which the employee was compensated.  (George Dep. at 141:13-15).  For example, George testified that for his employees, he would cross out unapproved overtime hours and revert the time sheet to the employee's schedule.  (George Dep. at 59:22-60:6 (Q: "And if any of

---

[12] There was testimony that there was no general instruction to cross out all clocked time on an employee's time sheet.  (*See* Deposition of Jay Williams, attached as Ex. A to Wilkinson Decl., Dkt. No. 129 ("Williams Dep.") at 62:14-18 (Q: "If an employee works an excess of their scheduled hours, are supervisors instructed to cross out the actual time and write in the scheduled time?"  A: "No.")).  It appears the practice was to cross out time that was not preapproved.

those individuals clocked in early, clocked out late, and that the total of amount of hours in excess of the scheduled number of hours, and they didn't receive preapproval from you or another supervisor, you would cross out the total time and write in the scheduled number of hours?"  A: "Yes.")).

*Third*, 11 employees submitted declarations that each attested to that the employee:[13]

- consistently clocked in to work prior to the start of scheduled shift time and immediately began work duties;

- consistently clocked out of work after the end of scheduled shift time, and worked from the end of their scheduled shift to the time they clocked out;

- was not compensated for the time they worked before or after their scheduled shift;

---

[13] Defendants argue that four declarations—of opt-in plaintiffs Joseph Sterling, Damian Cruz, Ronald Newsome, and Donald James—should be stricken because they did not appear for their depositions.  (Defs.' Resp. at 6-7).  Defendants cite to two orders issued by the Honorable Robert M. Levy, a Minute Order dated January 9, 2017, and one dated March 3, 2017.  Neither order requires the Court to strike or decline to consider testimony from declarants who fail to appear for a deposition.  Defendants do cite to an agreement where the parties apparently agreed to withdraw declarations of individuals who did not appear for deposition.  (Joint Letter on Discovery, Dkt. No. 119).  Plaintiffs do not respond to the allegation that these individuals did not appear for deposition, and the Court does not consider their declarations.  This does not change the Court's recommendation.

Defendants also argue that the declarations of Jerome Meriweather, Dawn Thompson, Cynthia Saunders, Damian Cruz, Ansdher Civil, John Finlator, Kamel Freeman, Bentley Alleyne, Shanita Sneed-Smith, Ronald Newsome, and Donald James should not be considered because their claims are subject to arbitration.  (Defs.' Resp. at 5-6).  As discussed *infra* at 20, Arbitrator Shriftman has found that these individuals must submit their claims to arbitration.  Although these declarants are having their claims sent to arbitration, their declarations may still be considered for class certification.  *See Rambarran v. Dynamic Airways, LLC*, No. 14-CV-10138, 2015 WL 4523222, at *6 (S.D.N.Y. July 27, 2015) ("[A] factual record also could have been developed through other sources, including the named plaintiffs, other putative class members, *and third parties*.") (emphasis added).  Arbitration only determines the forum of a dispute, not the validity of the evidence submitted.

- complained about the lack of overtime compensation to his or her supervisor (the declarations each contain supervisors' names);

- observed that other employees worked in the same way he or she did, *i.e.* clocking in before and after their respective shifts and working during that entire time; and

- observed and believed that other employees were also not compensated for their non-shift time.[14]

The declarations, except in one or two circumstances, do not tie specific employees to the time cards that are submitted in support of the class certification.  (*See* Ex. V (Time Records of Torin Golding, Jacqueline Young, Joseph Pierre, Shawn Johnson, Joseph Reynolds, Tremain Williams, Kevin McSloy, Osaroabasi Ejor, and Lynica Morales); *see also* Exs. R-U, attached to Wilkinson Decl., Dkt. No. 129).  Nor do these employees provide their own time cards to accompany their declarations.  None of the declarants

---

[14] (Meriweather Decl. ¶¶ 3-10 (patrolman in the Public Safety department); Thompson Decl. ¶¶ 3-8 (patrolwoman in the Public Safety department); Saunders Decl. ¶¶ 3-8 (officer in Public Safety department); Lopez Decl. ¶¶ 3-11 (captain in the Public Safety department); Civil Decl. ¶¶ 3-9 (patrolman in Public Safety department); Finlator Decl. ¶¶ 3-9 (Peace Officer in Public Safety department); Freeman Decl. ¶¶ 3-8 (patrolman in in Public Safety department); Peebles Decl. ¶¶ 3-10 (mechanic and plumber in Maintenance department); Alleyne Decl. ¶¶ 3-10 (lieutenant in the Public Safety department); Sneed-Smith Decl. ¶¶ 3-11 (a dispatcher in the Public Safety department); Bell Decl. ¶¶ 3-9 (employee in the Maintenance department); *see also* "Individuals Referenced in the Parties' Submissions," attached as Ex. B to Defs.' Supplemental Br., Dkt. No. 141).

were shown their individual time cards in their depositions in an attempt to impugn the validity of the declarations.[15]

Three opt-in plaintiffs who did not provide declarations did provide deposition testimony that is consistent with the 11 declarations.  (Deposition of Fernando Ariza, attached as Ex. D to Declaration of Wade C. Wilkinson in Further Support of and in Reply to Defendants' Opposition to Plaintiff's Motion Pursuant to Federal Rule 23 dated February 14, 2018 ("Wilkinson Decl."), Dkt. No. 129 ("Ariza Dep."); Deposition of Phyllis Edwards, attached as Ex. F to Wilkinson Decl., Dkt. No. 129, Ex. F ("Edwards Dep."); Deposition of Juana Nunez, attached as Ex. K to Wilkinson Decl., Dkt. No. 129, Ex. K ("Nunez Dep.")).  Ariza, for instance, testified that he worked on weekends and before and after his scheduled shifts without pay.  (Ariza Dep. at 29:20-22 (Q: "Did you get paid, at all, when you worked on the weekends?" A: "Never."); 35:12-15 (Q: "Would you perform work before 9:00 on a weekly basis?" A: "All the time.  Just go in and start working."); 68:16-69:3 (Q: "Earlier, you testified that you had often arrived early to work, you know, maybe 5, 10, 15 minutes early to work; is that correct?"  A: "Yes." Q: "Okay.  And during those times, you said you would clock in, and then immediately begin performing work; is that correct?"  A: "Correct."  Q: "During the times that you

---

[15] Several opt-in plaintiffs reviewed some form of time cards or time records prior to their depositions.  (*See* Ariza Dep. at 5:16-6:3; Bell Dep. at 25:12-18; Deposition of John Finlator, attached as Ex. G to Wilkinson Decl., Dkt. No. 129 ("Finlator Dep.") at 5:15-6:9; Deposition of Howard Brunson, attached as Ex. Q to Wilkinson Decl., Dkt. No. 129 ("Brunson Dep.") at 5:15-6:12; Deposition of Lawrence Peebles, attached as Ex. L to Wilkinson Decl., Dkt. No. 129 ("Peebles Dep.") at 15:8-17:19 (producing his own handwritten notebooks recording his time); Deposition of Jerome Meriweather, attached as Ex. J to Wilkinson Decl., Dkt. No. 129 ("Meriweather Dep.") at 5:5-9; 7:2-5 (reviewing and producing three check stubs).  Yet, these declarants were not shown these time cards during their depositions in order to cross examine them about their contentions that they worked from the time they clocked in.

would arrive early to work, and then also be performing duties before 9:00, did you see anyone else working?"  A: "Yes.")).

Edwards and Nunez provided substantially similar testimony.  (Edwards Dep. at 89:23-90:2 (Q: "Is it fair to say that when you arrived at 8:30, you would perform work and then clock in at 9:00 a.m.?"  A: "Yes."); Nunez Dep. at 37:9-18 (Q: "While you were in group 1, would you clock out at 4 o'clock, and then do the work, or would you do the work and then clock out?"  A: "I do the work before I clocked out."  Q: "If you were there until approximately 4:35 and you finished, you would clock out at 4:35?"  A: "Yes.").

In opposition to this evidence of a policy and these examples, Defendants proffered the testimony and declaration of Jay Williams ("Williams"), Rochdale's Assistant General Manager.  He stated in his declaration that Rochdale lacked a uniform policy: "Rochdale does not have a uniform wage and hour policy, other than a general policy of requiring that non-exempt employees are compensated at least minimum wage for all hours suffered or permitted to work and agreeing to pay at least time and one half the employee's base rate of pay for any overtime work."  (Williams Decl. ¶ 6).  Williams believed that Rochdale compensated employees for time worked, regardless of whether that was outside of one's shift time, and even if preapproval was not granted.  (Williams Dep. at 76:3-9 (Q: "[A]re they paid for time that they worked in excess of their scheduled base time?"  A: "Yes"  Q: "Regardless of whether it was approved or not?"  A: "Yes."); 46:2-10 (Q: "If an employee works before the start of their scheduled shift, let's say their shift is supposed to start at 9:00 a.m., and they start working at 8:50, what is the procedure for an employee to get paid for the time that they spent working before the start of their scheduled shift?"  A: "We pay for time worked.  There is no procedure.")).

Williams's testimony and an email from him, however, suggest that he believed employees were clocking in and out outside of their shift times, and were working during that period.  (*E.g.*, *id.* at 43:25-44:6 (Q: "Employees clock in when they start work and they clock out at the end of their day; is that correct?"  A: "Yes.")).  The email, to George, was dated April 29, 2015 and states that, "[i]t has come to our attention that employees from various departments at Rochdale are punching in between 10min to 30min early at the start of work and clocking out at various late times for lunch.  To help control these instances I'd like to discuss locking out the ability to punch at certain times."  (Email from Jay Williams to Darius George dated April 29, 2015, attached as Ex. S to Shalov Decl., Dkt. No. 126 ("Williams Email")).

  2. <u>Meal Breaks</u>

Plaintiffs also allege Defendants required employees to take a daily one hour break for meals and automatically deducted one hour from their pay regardless of whether not the employees worked during that time.  (Compl. ¶ 3).

Union employees were scheduled for meal breaks from 12:00 pm to 1:00 pm each day.  (George Dep. at 80:13-15).  Non-union employees received meal breaks from 12:30 to 1:30 pm.  (*Id.* at 80:16-17).  All employees clocked in and out for their meal breaks.  (*Id.* at 80:18-20 (union employees); 81:6-8 (nonunion employees)).  But regardless of when they clocked in or out, one hour per day was deducted from the total hours they worked.  (George Dep. at 81:6-13 (Q: "Are nonunionized employees required to clock in and out for meal breaks?"  A: "Yes."  Q: "If a nonunionized employee[ ] clocks out at 12:30 for their meal break and clocks back in at 1:00 p.m., are they still deducted the full hour?"  A: "Yes."); *id.* at 113:21-25; Rosales Dep. at 111:16-21 (Q: "If an employee clocks out for meal break and clocks back in prior to the expiration of the full hour, does

16

[Rochdale] still deduct the full hour for their meal break?"  A: "Yes."); *id*. at 113:11-16;

Goldsmith Dep. at 33:17-25 (Q: "So if an employee . . . clocks out for his meal break or

her meal break at noon, clocks back in at 12:45 and is performing work from 12:45 to the

end of their meal break at 1:00 p.m., and it's not preapproved by the manager, they're

not paid for that time, correct?" . . .  A: "Correct."); *id*. at 130:8-24 (Q: "So the policy . . .

is that if an employee clocks back in early from a meal break[ ], the full hour is

automatically deducted, correct?"  A: "To my knowledge.")).  Employees could, however,

receive pay for work performed during meal breaks if approved by management.

(Rosales Dep. at 103:19-22 (Q: "Well, they only get paid if it's approved by management,

right?" . . . A: "Yes.").[16]  George believes Scott initiated this automatic one hour

deduction policy.  (George Dep. at 81:14-18).[17]

       Some, but not all, of the opt-in plaintiffs stated that they were not compensated

for time spent working during meal breaks.  (*E.g.*, Thompson Decl. ¶ 9 ("[O]n days

where there was a fire or any other emergency, I had no choice but to work through my

lunch break.  Even though I worked an extra hour instead of taking my lunch, I was not

paid for this time."); Freeman Decl. ¶¶ 9, 12-13 ("On any given day, there was usually so

much work that I rarely got to use my lunch break.  Instead, on most days, my lunch

break was an extra hour that I worked.  However, I was never paid for this time.");

Peebles Decl. ¶¶ 13-15 ("In addition, because I was often the only man on duty for my

department, there were many times when there was too much work and I was unable to

---

[16] Unionized employees may have been compensated for such breaks pursuant to collective bargaining agreements.  (Rosales Dep. at 109:16-110:8).

[17] George did not see any of the employees he supervised ever working during the lunch break.  (George Dep. at 105:25-106:11).

take my lunch break at all.  Instead, my lunch break was an extra hour that I worked.

However, I was never paid for this time."); Alleyne Decl. ¶¶ 11-12 ("Therefore, instead of

having an unpaid lunch break, my lunch break was an extra hour that I worked, yet I

was never paid for it."); Sneed-Smith Decl. ¶ 10 ("However, I regularly perform at least

2-3 hours per week of off-the-clock work during my lunch break and am not

compensated for it.  I also participate in trainings during lunch breaks for which I am

not properly compensated.")).  Several employees who provided declarations about the

clock and shift policy did not attest to working during their lunch hours.  (*See, e.g.*,

Meriweather Decl.; Saunders Decl.).

  In October 2014 there was a memo sent from Scott to George indicating that no

one was permitted to work during lunch hour, unless they received preauthorization to

do so:

> Rochdale Village Inc., has established a universal policy that employees may
> only be at their desk during set work hours.  All office staff employees are
> required to be at their desk from 9:00 a.m. (not before) to 5:00 p.m.  All
> office staff **must** clock out for lunch at "**12:30 PM**" and return to their work
> areas at "**1:30 PM.**"  No one (unless authorized) is permitted to work during
> their lunch hour, or remain at their desk during the lunch period.  There is
> to be "no eating" at your desk, or work-station during working hours.

(Defs.' Resp., Ex. 4, Memorandum dated October 14, 2014 (emphasis in original)).

In addition to the October 4 memorandum, which stated that employees could not "be

at their desk" before any scheduled shift or during lunch, (Defs.' Resp., Ex. 4), two

substantially similar memos were issued on June 18, 2013 and December 19, 2013 to all

office staff from Goldsmith.  (Defs.' Resp., Exs. 2, 3).  Despite these memos, employees

still ate at their desks during the lunch hour.  (Goldsmith Dep. at 194:18-21 (Q: "You

said before that you routinely saw employees eat at their desk during uncompensated

meal breaks, correct?"  A: "Yes."); *id*. at 197:6-16 (Q: "So I know we just had a

conversation that you said it was probable that employees still would eat at their desk after 2013.  Regardless of these memos that went out, would employees still sometimes not follow the policy?"  A: "Definitely."  Q: "And eat at their desk?"  A: "Definitely."  Q: "During uncompensated meal breaks?"  A: "Um-hm.")).

In opposition to this evidence, Defendants have again proffered evidence from Williams, but his testimony suggests that if employees worked during meal breaks they were compensated.  (Williams Dep. at 134:15-23 (Q: "If an employee clocks back in at the end of their meal break, before their meal break is over, so for example, if an employee meal break is from 12:30 to 1:30 and they clock out at 12:30 but they clock back in at 1:00, are they paid for the half-hour that they spent working between 1:00 and 1:30?"  A: "Yes."); *id.* at 137:13-15 ("If they are working during their meal break, then they're compensated for that time worked.")).

D.  <u>Procedural History</u>

The Complaint was filed on February 2, 2015.  (Compl., Dkt. No. 1).  On August 10, 2015, Defendants filed a motion to dismiss the complaint.  (Motion to Dismiss for Failure to State a Claim, Dkt. No. 19).  On October 23, 2015, Judge Dearie denied Defendants' motion.  (Order dated October 23, 2015, Dkt. No. 33).

On May 23, 2016, Morales moved for conditional certification of a collective action pursuant to 29 U.S.C. § 216(b) of FLSA.  (Motion to Certify FLSA Collective Action, Dkt. No. 51).  On August 15, 2016, the Honorable Robert M. Levy granted the motion.  (Order dated August 15, 2016, Dkt. No. 63).  To date, 124 Rochdale employees have opted in to the purported class.  (Pls.' Br. at 3).  Defendants filed a motion for a pre-motion conference to de-certify the conditional certification of a collective action on May 1, 2018, (Letter Motion for Pre-Motion Conference, Dkt. No. 139), which was then

referred by Judge Dearie, (Order dated May 2, 2018).  The Court denied the motion without prejudice in light of the instant motion for class certification under Rule 23. (Order dated May 7, 2018).

On March 3, 2017, Defendants filed a motion to compel arbitration for employees who were members of SSOBA during the class period.  (Motion to Dismiss or Compel Arbitration, Dkt. No. 102 at 8).  On August 16, 2017, Judge Dearie granted the motion and directed the parties to submit the issue of whether SSOBA employees must proceed to arbitration to the arbitrator.  (Order on Motion to Dismiss or Compel Arbitration, Dkt. No. 118).  Following the Court's decision, two separate arbitrations were held.  On May 16, 2018, arbitrator Elliot D. Shriftman ("Shriftman") found, relying on the SSOBA collective bargaining agreement that "the SSOBA represented employees may not participate in the action filed by Lynica Morales in Federal Court."  ("May 2018 Order") (Defendants' Letter on Arbitration dated July 24, 2018, Dkt. No. 143 ("Defs.' Letter"), Ex. A).[18]  Opt-in plaintiff Kamel Freeman commenced a second arbitration proceeding before arbitrator Martin Ellenberg ("Ellenberg") against Defendants.  On July 20, 2018, Ellenberg held that "[c]laimants do not have standing to file for arbitration, a right reserved to the Union."  (Defs.' Letter, Ex. B).

On February 14, 2018, Morales, Thompson and Saunders moved to certify a class of all hourly paid and non-exempt employees of Rochdale Village under Fed. R. Civ. P.

---

[18] Plaintiffs dispute the validity of the May 2018 Order, and seek to take discovery on the validity of the decision, among other matters.  (*See* Plaintiffs' Letter on Arbitration dated July 25, 2018, Dkt. No. 144 ("Pls.' Letter") at 2; Defs.' Letter at 1-2). This opinion is not intended to resolve those issues, and whether the members of SSOBA are members of the proposed class does not affect the Court's decision on certification.  The Court concludes, *see supra* at n.14, that it is permissible to consider the evidence from SSOBA employees in resolving this motion, regardless of whether their claims are ultimately resolved in arbitration.

23(b)(3), a total of 483 individuals, and to appoint M&S as class counsel.  (Pls.' Br. at 3, 19).

The Court held an oral argument on the motion on April 20, 2018, and the parties were granted an opportunity to provide supplemental submissions.  (Minute Order dated April 20, 2018).  Defendants filed a supplemental memorandum, (Dkt. No. 141), as did Plaintiffs, (Dkt. No. 142).

<u>Discussion</u>

I.   <u>Legal Standards</u>

Class certification is governed by Federal Rule of Civil Procedure 23.  "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Plaintiffs seeking class certification under Fed. R. Civ. P. 23 must satisfy each of the conditions of Rule 23(a), and must demonstrate that their action fits within one of the three categories of Rule 23(b). *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

"The party seeking 'class certification must affirmatively demonstrate . . . compliance with the Rule,' and a district court may only certify a class if it 'is satisfied, after a rigorous analysis,' that the requirements of Rule 23 are met." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237-38 (2d Cir. 2012) (*quoting Wal-Mart*, 564 U.S. at 350 (further internal quotations omitted)).  "Rigorous analysis" means that:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making

such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*In re Initial Public Offering Sec. Litig.*, 471 F.3d at 41.

The Court, for the purposes of this motion, is evaluating whether there should be a class defined as all "current and former non-exempt hourly employees of Rochdale" for the six years prior to the filing of the Complaint except for employees whose claims must be arbitrated pursuant to the May 2018 Order.  (Pls' Br. at 1).

A.  Rule 23(a)

Under Rule 23(a), plaintiffs must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are referred to as numerosity, commonality, typicality, and adequacy.  In addition, Rule 23(a) has been held to contain an implicit requirement of "ascertainability."  *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003).  Plaintiffs must satisfy each of these requirements by a preponderance of the evidence.  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *Novella v. Westchester Cty.*, 661 F.3d 128, 148-49 (2d Cir. 2011).

1.  Numerosity

Rule 23(a)(1) requires that the prospective class be so numerous that joinder is "impracticable." "Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder." *In re Indep. Energy Holdings PLC, Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002); *see also Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

Numerosity is presumed for a class of forty or more because joinder of individuals in such a group would be impracticable. *Cons. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiffs need not establish the precise number of class members so long as they reasonably estimate that the number is substantial, and they may rely on reasonable inferences drawn from the available facts. *Robidoux*, 987 F.2d at 935.

Defendants do not contest that numerosity is met in this case. Plaintiffs' papers allege that there are over 480 class members, a number well above that where numerosity is presumed. (Pls.' Br. at 1).

Although not contesting numerosity, Defendants point out that at least 137 class members are parties to collective bargaining agreements that require their claims to be resolved in arbitration. (Defs.' Resp. at 23; Oral Argument Tr. at 33:19-34:2). Of the 137, 105 are members of the SSOBA union and 32 are in Local 94. (*Id.* at 33:19-34:2). As discussed, the May 2018 Order indicates that the claims of 105 members of SSOBA are subject to arbitration. (Dkt. No. 143 at 2). Removing these 105 individuals from the class, the numerosity requirement is still met.

2.  Commonality and Typicality

The commonality and typicality requirements tend to merge with each other, because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately represented in their absence."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

Commonality exists if plaintiffs' claims share a common question of law or of fact.  This requires the "plaintiff to demonstrate that the class members 'have suffered the same injury,'" *Wal-Mart*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 157), not "merely that they have all suffered a violation of the same provision of law."  *Id.* ("Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor.").

"To establish liability under . . . FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated[.]" *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011).  "Commonality is usually satisfied in wage cases 'where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices.'"  *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 208 (E.D.N.Y. 2015) (quoting *Lewis v. Alert Ambulette Serv. Corp.*, No. 11-CV-442, 2012 WL 170049, at *10 (E.D.N.Y. Jan. 19, 2012)).

As for typicality, "Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.  When it is alleged that the same unlawful conduct was directed at or both the named plaintiff and the class

sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37 (citations omitted); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).  Typicality is satisfied where "the minimum wage and overtime claims alleged by Plaintiffs are similar to those of the class members and arise from the same allegedly unlawful practices and policies . . . despite differences in damages arising from a disparity in injuries among the class members." *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 128 (S.D.N.Y. 2011).

There is a preponderance of evidence that all employees at Rochdale suffered the same injury from the same policy at Rochdale, an injury that amounts to a violation of FLSA and NYLL.  That is, they were all subject to a schedule-based wage policy that paid them solely based on their scheduled hours, not on the hours reflected by the times they clocked in or out of work, unless they received preapproval.  At least one senior manager at Rochdale, a person who had been the controller for 32 years, (George Dep. at 13:4-12), testified repeatedly at this deposition that such a policy existed.  (George Dep. at 36:1-16; 40:6-10; 53:10-54:11; 61:8-16; 62:6-12).  And while he was not the supervisor for all employees at Rochdale, he confirmed that the policy was in place until at least 2015, and in operation across the major units of Rochdale.  *Supra* at 6-9.  George's testimony was buttressed by the unanimous declarations by 11 employees, all of whom attested that they were subject to such a policy, and in describing the policy did so in nearly identical terms: as one that compensated them solely on scheduled time, not on times they were clocking in or out of work.  *Supra* at n.11.  Outside of the declarations, there is also deposition testimony of an additional three employees who testify that they were subject to such a policy.  *Supra* at 14-15.

And the testimony and declaration of Williams—who testified that Rochdale paid all overtime—does not ultimately help Rochdale.  Other than denying that there is a uniform policy regarding overtime, Williams confirms that: employees were clocking in and out outside of their shifts; employees clock in when they begin working; and employees should be paid for that time.  (*Supra* at 15-16; *see also* Williams Dep. at 82:9-12 (Q: "So even if they clocked in 15 minutes before the start of their scheduled shift, they should be paid for that time?"  A: "Yes.")).

There are some gaps in the evidence.  The employee declarations, as noted, do not tie to particular time cards.  Nor were the declarants shown their time cards when they were deposed.  As a result, none of the time cards submitted to the Court in which a supervisor allegedly crossed out time and replaced it with scheduled time (*e.g.*, Ex. V) actually tie to the declarants.  Ultimately, this does not matter, because the evidence from the declarants establishes that there were employees who were subject to the same common policy at Rochdale.  And these employees have come forward to say they clocked in and clocked out of work outside of their scheduled times, worked during the periods, but were not compensated for the overtime.  *See supra* at n.11.  Whatever gaps exist in Plaintiffs' evidence, they still have come forward with sufficient evidence to establish commonality.

Defendants offer a number of arguments about the absence of commonality and typicality.  These arguments are without merit.

They first contend that George's testimony is limited in value since it only goes to the employees he supervised.  (Defs.' Resp. at 9 n.2).  Not so.  George did speak about his practices viz. his department; but he clearly and unequivocally spoke about policies

across the company.  *See supra* at 7-8.  George's testimony is also bolstered by the
testimony of Morales, *id.*, and the opt-in plaintiffs.

In a similar vein, Defendants argue the employees who have submitted
declarations conceded their knowledge was limited to the Public Safety Department.
(Defs.' Resp. at 6).  As such, Defendants contend, their declarations are of limited
evidentiary value.

Defendants' suggestion that the knowledge of the declarants is limited to the
public safety department is simply wrong.  For instance, Defendants cite to the
testimony of Meriweather.  (Defs.' Resp. at 6).  In the cited pages, Meriweather does
testify that he worked in the public safety department, (Meriweather Dep. at 19:19-25,
21:25-22:3 (Q: "Were you always a patrolman at Rochdale Village?"  A: "Yes, sir." . . .  Q:
"What department would you be affiliated with as a patrolman?"  A: "Public safety."),
but Meriweather never concedes that he lacked knowledge about other departments.
Indeed, he declared: "I believe that all of the hourly employees who have worked at
Rochdale since my employment began were and are subject to the same policies and
procedures relating to when they clock in and out and that they were paid based on their
actual schedule.  In addition, all of these employees would engage in work related duties
once they clocked in; as such, all time clocked in is an accurate representation of time
actually worked." (Meriweather Decl. ¶ 9).  The other declarations similarly support the
claim that a common policy of paying for scheduled rather than actual work performed
existed across all employees as members of multiple departments testify as such.

Furthermore, if these declarations were all Plaintiffs relied on to establish a
common policy across Rochdale, that would call into question the proof of commonality.
This is not the sum total of the evidence.  These declarations, are reinforced by the

testimony of George—who stated the policy existed beyond his department (George Dep. at 39:19-41:10)—and other documentary evidence like the Rosales Email. *Supra* at 11. This evidence in the aggregate, is sufficient to demonstrate the common policy of not paying overtime existed across all of Rochdale.

Defendants then identify a number of sub-departments and divisions at Rochdale, and argue that employees worked in different areas for different supervisors, and performed different tasks. (Defs.' Resp. at 14). The multiplicity of departments and sub-departments at Rochdale does not defeat commonality. *Espinoza*, 280 F.R.D. at 127 ("The commonality requirement may be met when individual circumstances of class members differ, but their injuries derive from a unitary course of conduct.") (quotations omitted); *e.g.*, *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 343 (S.D.N.Y. 2004) ("All potential class members are alleged to have been harmed by a common practice— defendants' failure to adequately compensate employees for overtime hours."). Rochdale's employees may have worked in different areas for different supervisors, but they were subject to the same policy of not compensating overtime.

Nor does the existence of multiple sub-departments defeat typicality. *See Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 371 (S.D.N.Y. 2007) (rejecting argument that typicality is not met because named plaintiffs worked for one department while "workers in other departments performed different tasks on a different schedule"); *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 154-55 (S.D.N.Y. 2002) (although prospective class members worked on different vessels, doing different jobs in different departments that calculated overtime pay using different methods, "[a]s long as plaintiffs assert . . . that defendants committed the same wrongful acts in the same manner against all members of the class, they establish necessary typicality.")

28

(quotations omitted); *Moreira v. Sherwood Landscaping Inc.*, No. 13-CV-2640, 2015 WL 1527731, at *11 (E.D.N.Y. Mar. 31, 2015) (rejecting defendants' argument that plaintiffs have not satisfied the commonality and typicality requirements because their proposed class includes employees who were paid different rates of pay, and performed different job functions in different departments under different managers).

Then, to suggest there is no policy of not paying overtime, Defendants cite to various instances in which supervisors did approve overtime. (Defs.' Resp. at 9 n.3). Defendants' characterization of the depositions they cite is inaccurate. The declarants do not uniformly state they received overtime pay. Brunson testified that *sometimes* when he spoke to a supervisor he would get paid the worked overtime, but not always. (Brunson Dep. at 46:11-19 (Q: "If you stayed past the end of your shift, did you always tell your supervisor?" A: "Yes, I did." Q: "Were you always paid when you stayed past the end of your shift?" A: "Not every time, no." Q: "How many times would you say you weren't paid?" A: "It happened a lot of times.")). The same was true of the other deponents. (Deposition of Tyrone Absolam, attached as Ex. 22 to Declaration of Jonathan Bardavid ("Bardavid Decl."), Dkt. No. 128 ("Absolam Dep.") at 63:4-7 (testifying that there were some times he was paid overtime); Deposition of George Bell, attached as Ex. E to Wilkinson Decl., Dkt. No. 129 ("Bell Dep.") at: 27:18-24 ("sometimes" corrections were made); Peebles Dep. at 32:14 ("Sometimes I didn't get paid."); Deposition of Winston Hadaway, attached as Ex. I to Wilkinson Decl., Dkt. No. 129 ("Hadaway Dep.") at 30:2-3 (Q: "[W]ere you paid for that time?" A: "No.")). Regardless, whether a particular supervisor approved overtime, or whether an employee was paid on certain days, is a question affecting damages, but it does not does not demonstrate the absence of the alleged policy. *See Ansoumana v. Gristede's Operating*

*Corp.*, 201 F.R.D. 81, 86 (S.D.N.Y. 2001) ("The differences among the Plaintiffs as to the number of hours worked, the precise work they did, and the amount of pay they received concern the amount of damages to which any individual Plaintiff might be entitled if and when liability is found."); *Jianmin Jin v. Shanghai Original, Inc.*, No. 16-CV-5633, 2018 WL 1597389, at *12 (E.D.N.Y. Apr. 2, 2018) ("That the facts of each workers' claims, and the amount of damages they can recover—if any—may differ is irrelevant" to commonality).

Finally*,* defendants also argue the proposed class fails under *Wal-Mart.* Because "punching in" is not synonymous with working, Defendants contend, there is no common contention "capable of classwide resolution," such that "in one stroke" the validity of class members claims can be assessed. (Defs.' Resp. at 11 (quoting *Wal-Mart*, 564 U.S. at 350)).

In an abstract sense, if there were no evidence that employees worked during their clock times, or if there were a preponderance of evidence that employees worked only during their scheduled times, the proposed class would fail. But we do not have that abstract case. Plaintiffs have come forward with many declarations and deponents who have attested that they worked (often, if not consistently) outside of their scheduled shifts. These employees have testified that they did work from the time they clocked in up until the time they clocked out. It would be one thing if Defendants had come forward with evidence that these employees did not work outside their scheduled shift times, but they have not.

Defendants have not disproven the overtime claim of a single declarant. Each declarant (and many deponents) identified one or more of their supervisors. No declarations or evidence is offered from these supervisors to suggest that the employees'

assertions about when they worked or the failure of Rochdale to pay overtime are incorrect.[19]  Nor were the declarants confronted with their time cards to disprove their allegations of working outside their shift times.

There is substantial record evidence from employees that they worked uncompensated overtime pursuant to a policy that only paid them for scheduled time. As a result, the various legal authorities Defendants gather (Defs.' Resp. at 11-12) are inapposite.  To be sure, if an employee clocks in and does no work, that is not compensable; that is an unremarkable proposition.  But Plaintiffs have offered evidence to show that a class of employees *did* work during their clock times, and were not compensated; that is, they have identified a common employment policy class members were subject to, and as such, their claims arise from a common course of events.

Quite separate and apart, the virtually unrebutted evidence surrounding the meal break policy is also sufficient to establish commonality and typicality.  A number of employees—although fewer than in support of the policy of not paying employees outside of shift time—declared and testified that Rochdale's policy was to deduct one hour for lunch, regardless of whether the employee worked during that break.  *See supra* at 16-17.  These employees stated consistently that they worked during such

_____

[19] Defendants also argue there were many different reasons why employees worked before and after their shifts.  (Defs.' Resp. at 13-14 ("[N]one of the Opt-In Plaintiffs provided a consistent reason for why they allegedly worked[.]")).  That there are different reasons an employee worked during non-shift times or the times they worked was different, does not establish that the alleged policy did not exist.  If anything, it establishes that employees *were* working outside of their shifts, albeit for myriad reasons.  *Ferreras v. Am. Airlines, Inc.*, No. 16-CV-2427, 2018 WL 1169127, at *5 (D.N.J. Mar. 6, 2018) ("The fact that there will be individualized variations among the members of the putative class as to their reasons for working through meal breaks, for clocking in early or clocking out late, or for working off the clock, should not defeat the certification of this action as a class action.").

breaks and were not compensated.  *Id.*  George, Rosales and Goldsmith also testified

that the policy existed, and Goldsmith saw employees remain at their desks during their

lunch break.  *Supra* at 18-19.  In response, Defendants argue that there was a memo

instructing employees not to work such breaks.  (Defs.' Resp. at 11 n.5).  But the

existence of the memos does not establish either that employees did not work during

breaks or that Rochdale compensated employees for that work.  Indeed, Goldsmith

testified that they remained at their desks, despite those memos.  (Goldsmith Dep. at

197:2-16).

### 3.  Adequacy of Representation

To satisfy Rule 23(a)(4), the class representative must "fairly and adequately

protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  That is, a class representative

must "possess the same interest and suffer the same injury as the class members."

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  The adequacy

requirement examines whether the class members have interests that are "antagonistic

to one another."  *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 290-91 (2d

Cir. 1992) (quotations omitted).

Defendants have challenged the proffered lead plaintiffs.  They argue that

Plaintiff Lynica Morales cannot be a class representative, because she served as a

supervisor and signed off on various time sheets.  (Defs.' Resp. at 16).  As a supervisor,

she may have participated in the challenged conduct, and therefore has interests

antagonistic to those of class members.  (*Id.*)

In her capacity as supervisor, Morales had a role—perhaps a limited one, but a

role nonetheless—in reviewing and approving the time sheets of opt-in plaintiffs in the

case.  (Oral Argument Tr. at 16:18-17:7 ("She was the one who was responsible for

determining whether or not the overtime was approved.  She reviewed the time sheets and said yes, you worked before your shift, no, you didn't.  So there's clearly a conflict.")).  As a result, she may be required to opine on the ultimate merits of other class members.  As a result, the Court believes she could potentially have antagonistic interests to other class members.

Dawn Thompson and Cynthia Saunders cannot serve as adequate class representatives, since they are members of SSOBA and their claims must be resolved in arbitration.  *See supra* at 4, n.14.  When none of the named plaintiffs are adequate class representatives, a court "may order the joinder of additional representatives to ensure the adequate representation of the entire class."  7A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 1765 (3d ed. 2018).  *See, e.g.*, *Houser v. Pritzker*, 28 F. Supp. 3d 222, 256 (S.D.N.Y. 2014) (joining two named representatives after named representatives found to be inadequate).

In response to the challenges to Morales, Thompson and Saunders, Plaintiffs have proffered Howard Brunson and George Bell as lead plaintiffs.  (Pls.' Reply at 5).  Neither Brunson or Bell have been challenged by Defendants, and they may serve as lead plaintiffs.  Both plaintiffs have submitted declarations that demonstrate their understanding of the claims in this case; their declarations also evidence sufficient financial interest to vigorously pursue the litigation and actual interest in serving as class representatives.[20]  (Declaration of Howard Brunson, attached as Ex. W to Wilkinson Decl., Dkt. No. 129 ("Brunson Decl.") ¶¶ 1-2; Declaration of George Bell, attached as Ex. X to Wilkinson Decl., Dkt. No. 129 ("Bell Supplemental Decl.") ¶¶ 1-2).

---

[20] The declaration and deposition of Brunson were first submitted in reply by Plaintiffs.

*See Velez v. 111 Atlas Rest. Corp.*, No. 14-CV-6956, 2016 WL 9307471, at *23 (E.D.N.Y. Aug. 11, 2016).

Should the District Court accept this report and recommendation, either Brunson or Bell or both should be joined as co-lead plaintiff(s).  This recommendation should not be read to suggest that Morales, Saunders or Thompson's individual claims lack merit.

### 4.  Ascertainability

"There is an implied requirement that the membership of the class is identifiable and ascertainable." *Jankowski v. Castaldi*, No. 01-CV-0164, 2006 WL 118973, at *5 (E.D.N.Y. Jan. 13, 2006) (citing *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).  That is, it must be "administratively feasible for a court to determine whether a particular individual is a member of the class [and t]he Court must be able to make this determination without having to answer numerous individualized fact-intensive questions." *Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 181 (S.D.N.Y. 2005) (quotations omitted).

No issues with ascertainability exist in this case.  The parties have already identified the former and current employees of Rochdale Village in the context of the conditional certification motion.

## II.   Rule 23(b)(3)

Plaintiffs seeking to certify a class under Rule 23(b)(3) must show that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for the fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  These requirements are referred to as the predominance and superiority requirements.

A.  <u>Predominance</u>

Fed. R. Civ. P. 23(b)(3) requires that plaintiffs show that common questions "predominate over any questions affecting only individual members[.]"

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  "Even if Rule 23(a)'s commonality requirement may be satisfied by that shared experience, the predominance criterion is far more demanding." *Id.* at 623-24.  "[T]o meet the predominance requirement . . . a plaintiff must establish that the issues . . . that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (quotations omitted).  Plaintiffs need not prove, however, that the legal or factual issues that predominate will be answered in their favor.  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013).  "[I]ndividualized damages determinations alone cannot preclude certification under Rule 23(b)(3)," but it is a factor to "consider in deciding whether issues susceptible to generalized proof outweigh individual issues." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408-09 (2d Cir. 2015) (quotations omitted).

The Court finds that Plaintiffs have demonstrated, by a preponderance of the evidence, that common issues are likely to predominate.  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 37 ("Complying with Rule 23(b)(3)'s predominance requirement cannot be shown by less than a preponderance of the evidence.") (quotations omitted).  Specifically, Plaintiffs have shown through declarations, depositions by opt-in plaintiffs and other exhibits including Defendants' own memoranda and testimony by Rochdale management that Rochdale's nonpayment of unapproved employee overtime (for work

35

outside of shift times and during meal breaks) is a common issue applicable to the entire class and subject to generalized proof; and, as explained below, that issue predominates over the issues specific to any one individual employee.

Defendants contend that the only way the predominance standard is satisfied is if the Court accepts that when an employee clocks in and clocks out, the employee is working. If not, then the case would devolve into a series of individualized inquiries (with proof needed from both the employee and his supervisor) about whether there was actually work done outside of shift times or during meal breaks. Defendants are correct; if Plaintiffs are unable to establish that the clocking in and clocking out times evidence actual work done, there would be differentiated individualized issues that would make class treatment difficult. But Plaintiffs have made the requisite showing; as explained in analyzing commonality, the employee declarations are essentially unrebutted. Those declarations demonstrate employees began working when they clocked in, and they stopped when they clocked out. As a result, their clock times reflect time for which they were entitled to compensation.

Whatever individualized issues remain for these employees they are about damages, not proof.

Defendants argue that different employees had differing reasons for punching in and punching out before and after their shift. (Defs.' Resp. at 19-20). That employees testified they performed different tasks after punching in early is not a surprise; they have different jobs. As discussed above, employees need not have had the same reason for working overtime; class treatment would be appropriate so long as they worked during their punch out time. *Supra* at n.19.

36

Defendants also contend that three employees (Bell, Absolam and Nunez) testified they did not work when they clocked in or they performed non-compensable tasks.  (Defs.' Resp. at 20).  This argument does not survive record scrutiny.  For example, employee Bell did not say he did not work during his clock time, but rather he believes under his union contract he is entitled to additional compensation.  (Bell Dep. at 38:10-39:10).  Bell's contention only goes to damages; it does not demonstrate that his clock time is not a proxy for time worked.

Absolam testified about various tasks that he did before his shift time, including cleaning, turning on lights, and opening gates.  (Absolam Dep. at 22:5-17).  The context of the limited deposition excerpts provided to the Court suggests that Absolam believes these activities are integral to his job, and they are not *per se* noncompensable as Defendants argue.  *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 590 (2d Cir. 2007) ("[A]ctivities that are 'integral and indispensable' to principal activities are compensable under the FLSA (as well as the principal activities themselves).") (quoting *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956)).  In any event, there is nothing to suggest that Absolam's experience of only doing preliminary activities during non-shift times should be generalized to all the class members.  If that were the case, there might be a predominance problem; but the declarations and deposition testimony almost uniformly establish that employees were doing compensable work during outside of shift times, and during meal breaks.

As to the final employee, Nunez, at one point she testified that if her supervisor did not tell her to go to work, she would sometimes sit in a room at Rochdale.  (Nunez Dep. at 22:25-23:13).  But she explains that does not mean she clocked in and waited; rather she would clock in *after* she was told to work.  (Nunez Dep. at 24:10-13 (Q: "But

in situations where you arrived and you parked and he told you to start working, you would start working, right?"  A: "Yes."); *id.* 24:20-24 (Q: "Is it a fair statement to say then, that you were only working after you clocked in; is that a fair statement?" . . .  A: "Yes."). As such, her clock time did reflect the time she worked.  Therefore, the same straightforward arithmetic can apply to Nunez; no individualized liability inquiry is necessary.

Moreover, evidence submitted by the Defendants to counter the existence of a common policy actually demonstrates why class issues predominate.  Defendants submitted the testimony of Williams to suggest that employees were paid for all their work.  That may be, and the damages for employees may be zero.  But in making that argument, Williams essentially stated that clock times showed when an employee worked:

> Q: So if they're supposed to start working at 9:00 a.m. and they forget to punch in, after they've met, is it determined they're paid as if they clocked in at 9:00 am?
>
> A: No, they're clocked in for when they say they began working.
>
> Q: If they say they began working at 8:55, are they paid starting at 8:55?
>
> A: Yes.
>
> Q: No matter what?
>
> A: No matter what.
>
> Q: Well, how do they know they started working at 8:55, as opposed to nine?
>
> A: We trust our employee's word.

(Williams Dep. at 83:8-22; *see also id.* at 60:13-17 (Q: "So every employee at Rochdale is being monitored as to when they clock in and whether they go start to work immediately

or whether they do something else?"  A: "Yes."); 65:16-19 (Q: "All supervisors know the actual amount of hours worked by every single one of their employees?"  A: "Yes.").

Because Defendants have been unable to establish that liability questions are individualized for each of the class members (by for example, demonstrating that clock times are not equivalent to worked time), and Plaintiffs have come forward with significant (both in quantity and quality) evidence demonstrating that employees worked during their clock times, not just their shift times, the authorities Defendants cite are factually inapposite.

For example, in *Babineau v. Fed. Exp. Corp.*, (Defs.' Resp. at 12), the Eleventh Circuit affirmed a district court's denial of class certification.  576 F.3d 1183, 1184 (11th Cir. 2009).  The District Court found (in the context of the predominance inquiry) that there were many non-work reasons why employees were present at FedEx outside of their shift times.  FedEx provided—in contrast to Rochdale—ample evidence in the form of "employee testimony regarding the various non-work-related activities that took place during the gap periods and the various personal reasons that employees listed for coming in early and staying late."  *Id.* at 1192.

Similarly, in *Mendez v. U.S. Nonwovens Corp.*, (Defs.' Resp. at 22), only four employees stated they worked prior to or stayed after their shift times and were performing work during those gap periods.  312 F.R.D. 81, 100 (E.D.N.Y. 2014).  These claims were rebutted by a number of depositions, the testimony of which demonstrated that the plaintiffs, in fact, came in for a variety of reasons other than to perform work. The Court found that "sparse evidence" submitted in that case amounted to "unsupported" and "conclusory" statements.  312 F.R.D. at 97-98.

Neither is analogous to the present case.  Defendants have not proffered evidence suggesting that when Rochdale employees were at work outside of shift times they were not working.  The evidence is essentially one-sided in this regard: Plaintiffs have come forward with testimonial evidence they worked during their clock times, before and after their shifts, and provided names of supervisors in those declarations; and Defendants have countered with a largely unsubstantiated assertion that they were not working.  No declarations exist to suggest that the employees who stated and testified that they were working, were not doing so.  *Cf. Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 364 (S.D.N.Y. 2014) ("The employee depositions submitted in connection with this motion indicate unanimously that the plaintiffs performed on-the-clock pre- and post-schedule work and were not paid for it, and many employees testified that they knew others who also performed uncompensated on-the-clock work.").

As a result, the Court concludes that the "the primary hurdle to recovery is likely to consist predominantly of arithmetical calculations based on payroll records and other documentary evidence." *Ramirez*, 39 F. Supp. 3d at 369; *see also Noble*, 224 F.R.D. at 345 ("Although determinations as to damages, exempt status, and alleged labor agreements will require individualized findings, common liability issues otherwise predominate.  As such, these individualized damages inquiries do not bar certification.").  Plaintiff have, therefore, satisfied the predominance inquiry.

B. Superiority

A plaintiff must also show that proceeding as a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The court should consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of

any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

First, courts have found that in FLSA class claims, the damages suffered are small in relation to the expense and burden of individual litigation. *See, e.g.*, *Moreira*, 2015 WL 1527731, at *14; *Velez*, 2016 WL 9307471, at *24. Individual employees may receive damages equivalent to a few hours of work per week if they prevail. Plaintiffs themselves assert that most members of the class lack the resources to bring any individual litigation. (Pls.' Br. at 18). Second, there does not appear to be any other litigation similar to the claims in this case. The third factor is neutral, since this is not a multi-district or multi-jurisdictional litigation; all the cases, to the extent they are to be litigated in federal court, would be, because of the location of Rochdale, litigated in the Eastern District of New York. Fourth, the Court does not discern any class manageability problems. *See, e.g.*, *Ferreras*, 2018 WL 1169127, at *7 (finding that manageability problems would be unlikely given company's records would reveal names of class members and the hours clocked in for work).

Thus, the Court concludes that "[a] class action is superior to other available methods of adjudication in these disputes because it allows for a more cost-efficient and fair litigation of common disputes." *Damassia v. Duane Reade*, Inc., 250 F.R.D. 152, 164 (S.D.N.Y. 2008) (collecting FLSA and NYLL cases).

III.   Rule 23(g)

In appointing class counsel, Fed. R. Civ. P. 23(g) requires the court to consider: the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and claims of

the type asserted in the action; counsel's knowledge of the applicable law; and the resources counsel will commit to representing the class.  Rule 23(g)(1)(A).  Plaintiff's counsel, the law firm M&S, affirm that they have performed a significant amount of work in investigating the potential claims in this action; they have litigated a substantial number of cases including those in the FLSA context; they are familiar with the FLSA and NYLL, and that they have the financial resources to represent the class.  (Shalov Decl. ¶ 8).

Defendants do not contest M&S's adequacy as class counsel.  Courts in this Circuit have also appointed M&S as class counsel in past cases.  *See, e.g.*, *Ramirez*, 39 F. Supp. 3d at 365.  Accordingly, the court finds that Plaintiffs' counsel is qualified, experienced and generally able to conduct the litigation.

IV.   Scope of the Class

The Court recommends that a class be certified of "[a]ll current and former non-exempt hourly employees of Rochdale . . . in the State of New York at any time from the six years prior to the filing of the Complaint to the entry of judgment in this case."  (Pls.' Br. at 1).  "[C]ourts in the Second Circuit routinely certify class actions . . . so that New York State and federal wage and hour claims are considered together."  *Damassia*, 250 F.R.D. at 163 (collecting cases).  As such, this is a class covering both FLSA and NYLL claims.  Employees whose claims are subject to the May 2018 Order, namely members of SSOBA, are excluded from the class.

Defendants argue that on November 15, 2015, Rochdale issued a written policy that prohibited employees from working outside of their non-scheduled times, whether before or after their shifts or during meal breaks.  (Defs.' Resp. at 25-26).  They cite to a number of depositions and declarations by opt-in plaintiffs, which state that they are no

longer allowed to work during these periods, (*see, e.g.*, Bell Decl. ¶ 6 ("This stopped recently, however, as we are no longer allowed to arrive at work before our scheduled shift time."), and cases that state that such a policy is lawful.  As such, Defendants argue that the scope of the class should be limited to pre-November 15, 2015 claims.

That there is a policy prohibiting employees from working outside of their shift schedules does not mean that employees did not in fact work outside of their shift times. For example, Goldsmith testified that even after two other memos were issued in on June 18, 2013 and December 19, 2013 to all office staff, (Defs.' Resp., Exs. 2, 3), employees worked during their lunch or meal breaks.  (Goldsmith Dep. at 193:8-13; 194:14-24; 197:2-16).  Furthermore, employees stated that the period in which they were not paid overtime extended beyond November 2015, the date of the memo.  (*See, e.g.*, Meriweather Dep. at 38:14-18 (Q: "Aside from the initial five-month period, after that, through November of 2016, were there still issues with payment of overtime?"  A: "Yes, sir."); Civil Decl. ¶¶ 2-3 ("Between 2013 and the present, my hours are 12:30am to 8:30am. . . .  Throughout my employment at Rochdale, I often work overtime on a weekly basis.  Even though I consistently work overtime, I am not paid for it.").

Separately, Defendants cite no authority to suggest that if an employer prohibits working overtime, but the employee still is caused to or does work overtime, the employer is not liable under NYLL or FLSA for unpaid overtime.  There is, therefore, no basis to limit the temporal reach of the class to pre-November 2015 claims.

Defendants also argue that that Power Plant employees be excluded from the class, because there is no evidence that such employees were subject to the policies alleged.  (Defs.' Resp. at 22-25).  As noted earlier, Defendants' arguments to limit the applicability of declarations is without merit; employees testified or declared, as did

43

members of management (like George), that the policy of paying employees only for shift time was one that existed throughout Rochdale.  *Supra* at n.13.  And when managers like Williams sent emails about the practice of employees clocking in and after shift times, or sent memos suggesting employees could only be at their desks during shift times, they did not suggest Power Plant employees were not subject to the practice or policy.  There is no reason to exclude Power Plant employees from the scope of the class.[21]

*          *          *

Like with most of Defendants' arguments, the attempt to limit the temporal scope of the class addresses what documents and testimony the Court may or may not consider, but largely fail to rebut the significant evidence put forward by Plaintiffs that there was a policy of not paying employees outside of their shift times.

## Conclusion

For the reasons stated above, it is respectfully recommended that the proposed class of all current and former non-exempt hourly employees of Rochdale at any time from the six years prior to the filing of the Complaint be certified and Plaintiffs' class certification motion be granted.  Because employees subject to the May 2018 Order are having their claims resolved in arbitration, they should be excluded from the class.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by

---

[21] The 32 individuals who are members of Local 94, who work at the Power Plant, have not had their claims sent to arbitration; as a result, there is no reason, at this time, to exclude them from the class.

the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections may waive the right

to appeal the District Court's order.  *See Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604

(2d Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a

waiver of any further judicial review of the magistrate [judge's] decision.").

/s/ *Sanket J. Bulsara* August 1, 2018
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York